UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

TERRELL YOUNG,                          Case No. 3:17-cv-00118-HDM-CLB

                    Petitioner,

        v.                                      ORDER

BACA, et al.,

                    Respondents.

This counseled habeas petition pursuant to 28 U.S.C. § 2254 comes before the court for consideration of the surviving claim of petitioner Terrell Young's ("Young") second amended petition. (ECF No. 32). Respondents have answered (ECF No. 73), and Young has replied (ECF No. 76).

In addition, Young has filed a motion for evidentiary hearing to develop his claim of equitable tolling. (ECF No. 77). Respondents have opposed (ECF No. 78), and Young has replied (ECF No. 82).

## I.   Factual and Procedural Background

Young challenges his 2006 state court judgment of conviction, following a jury trial at which he represented himself, of four counts of murder in the first degree with use of a deadly weapon and ten other associated counts, including kidnapping, burglary, robbery, and conspiracy to commit murder. (Ex. 287).[1]

---

[1] The court cites primarily to respondents' set of exhibits, which are located at ECF Nos. 45-56, 69 and 70. ECF No. 69 is a corrected image of Exhibit 273. The court cites to these documents by exhibit number. The transcripts of Young's interviews with investigators on September 2, 1998, were filed by respondents separately at ECF No. 80. The court refers to these documents by their docket number.

On August 14, 1998, Matt Mowen, Tracey Gorringe, Jeff Biddle, and Peter Talamantez were found murdered in a home on Terra Linda Avenue in Las Vegas, Nevada. Donte Johnson, Sikia Smith, and Young were investigated as suspects.

On September 2, 1998, Young was arrested and questioned. After several hours of questioning, Young confessed to participating in the quadruple murders.

Young was charged with fourteen counts, including four counts of first degree murder with use of a deadly weapon, four counts of first degree kidnapping with use of a deadly weapon, four counts of robbery with use of a deadly weapon, one count of conspiracy to commit robbery and/or kidnapping and/or murder, and one count of burglary while in possession of a firearm. (Ex. 7).

Young was convicted on all counts in 1999. (Ex. 72). His conviction, however, was reversed by the Nevada Supreme Court in 2004, on the grounds that the trial court had abused its discretion in refusing to grant Young's motion to dismiss counsel and appoint new counsel. The case was remanded for a new trial. (Ex. 149).

Before the second trial commenced, Young moved to represent himself. (Ex. 163). The trial court held a hearing, canvassed Young, and then granted his request. (Ex. 166). Standby counsel was appointed. (Ex. 184).

Among several other motions filed by Young in proper person was a motion to suppress his confession. (Exs. 176 & 198). The court conducted an evidentiary hearing. (Exs. 253-55). Testimony and evidence at the hearing established the following.

On September 2, 1998, Sergeant Hefner spotted Young walking in front of the police station. Hefner, Detective Thowsen and

Detective Buczek approached Young as he stood at a bus stop. As they asked Young to identify himself and reached out to detain him, Young began to run. A scuffle ensued, involving all three officers and Young, which spilled at one point into the busy street. The officers were eventually able to restrain Young and handcuff him to the bench. Young was then brought into the station and placed in an interview room. (Ex. 255 (49-51)).

In the interview room, Detective Buczek read Young his *Miranda* rights and, at 11:50 a.m., Young signed a card acknowledging he understood those rights. (Ex. 225 (Tr. 51-54)). Buczek advised Young that by signing the card, Young was acknowledging that the card was read to him. (Ex. 255 (Tr. 68-71)).

From 12:22 p.m. to 12:53 p.m., a recorded interview took place. (ECF NO. 80-1). During the interview, conducted by Buczek and at which Thowsen was present, Young denied any involvement in the murders. (*Id.* at 14-15, 20).[2]

Shortly after, Detectives Hardy, Chandler and, at times, Thowsen, questioned Young about an unrelated murder. Some questions touched on the quadruple murders, as well. They spoke unrecorded for less than an hour, then at 2 p.m., the recorder was turned on. (Ex. 254 (Tr. 24-25); ECF No. 80-2). Young was asked if he remembered being advised of his *Miranda* rights by Detective Thowsen. Young acknowledged he had been advised of his rights but

_____

[2] There has been no assertion in these proceedings that the transcripts do not accurately reflect the content of the recorded interviews. The trial court and Young's attorney in his first trial both listened to the recordings and concluded the transcripts were faithful transcriptions of the audible portions of the recordings. (Ex. 255 (Tr. 30-31); Ex. 266).

indicated it was Buczek who had advised him. (ECF No. 80-2 at 3; Ex. 254 (Tr. 26)).

   In the recorded second interview, Young continued to deny any involvement in the quadruple murders. (*See, e.g.*, ECF No. 80-2 at 68-69). The interview ended when Young requested that the tape be turned off so he could discuss with the detectives what kind of deal he could get if he told them the full truth. (ECF No. 80-2 at 160-61; Ex. 254 (Tr. 29-30)). In total, the second interview, on and off tape, was less than four hours. (*Id.* at 31).

   Young was then transported to Clark County Detention Center. While the booking paperwork was being completed, Young told an officer that he wanted to speak with Thowsen. (Ex. 275 (Tr. 37-38)). At 6:30 p.m., Young met with Thowsen and signed a consent to submit to a Buccal swab, and the swab test was administered. (Ex. 253 (Tr. 42-43)). Thowsen and Young then had an unrecorded conversation, which likely began at around 6:40 p.m. (*Id.* at 43-44). Thowsen reminded Young that he had been advised of his rights and asked if Young understood they still applied, and Young said he did. (*Id.* at 48-49, 53-54).

   At 7:55 p.m., the recorded interview began. (ECF No. 80-3). At the beginning of the interview, Young acknowledged that he had asked to speak with Thowsen because he wanted to tell the truth about what happened, and that he understood his rights still applied. Young then provided details about the murders and admitted to his involvement. Toward the end of the interview, Young said he was telling the truth because "the other guy said I was going to die" and that made him think about his girlfriend and her baby and

the victims' families. (ECF No. 80-3 at 51-52).[3] The interview ended at 8:45 p.m. (*Id.*)

Thowsen testified that during the third conversation, the tape recorder was never turned off except to switch the tapes from Side A to Side B or insert another tape. (*Id.* at 37-38). During Young's first trial, an expert had evaluated the tapes and found that no alterations had been made nor had the tapes been tampered with. (Ex. 253 (Tr. 35-36); Ex. 255 (Tr. 31-34)).

The detectives who testified at the evidentiary hearing agreed that there were conversations with Young that were not recorded on that day. However, they asserted that at no time, on or off recording, did Young invoke his rights, and he was never promised anything to make a statement. (Ex. 253 (Tr. 32-34); Ex. 254 (Tr. 28-30)); Ex. 255 (Tr. 55-56, 61-62)). In response to a question by Young, Thowsen denied specifically that the first interview ended because Young invoked his rights. (Ex. 253 (Tr. 123-24)). Thowsen denied coaching Young as to what to say or that he should sound remorseful when doing so. (Ex. 253 (Tr. 71-74)). Thowsen also denied that he or anyone else told Young he was going to die or they were going to kill him. (*Id.* at 79-80).

Young waived his privilege against self-incrimination and testified. Before he did so, the court asked Young to discuss his decision with standby counsel (Ex. 255 (Tr. 98-99)). The State advised standby counsel that at least one subject of Young's potential testimony would open the door to questions about his involvement in the crime. (*Id.* at 99-100). Following Young and counsel's discussion, counsel told the court that he had advised

---

[3] Citation is to original page of document.

Young "until [he] was blue in the face … not to take the stand. That the only way he could go up there was with me wrapped around his ankle, kicking and screaming." (*Id.* at 100). The court advised Young that if he testified, he would be subject to cross-examination and would have to answer the State's questions if they were appropriate and legal. (*Id.* at 101). Young elected to testify.

According to Young, upon his arrest he was beaten up by five or six detectives, and once in the interview room, his rights were not properly explained to him, he was told he had to sign the card, and he was told he had to talk because he was being investigated for murder. (Ex. 255 (Tr. 103-05)). Young asserted that he told the detectives that he did not want to talk, and that he wanted counsel, several times, including at the end of the first interview, but that the detectives ignored him. (*Id.* at 105-06, 110). Young asserted that while the tapes were being turned over, Buczek told him he was going to die, that he was going to get the death penalty, and that this coerced him into confessing. (*Id.* at 107). Young testified that before his third interview was recorded, the detectives implied he would get a ten-year sentence, and they told him how to sound, what to say and what not to say. (*Id.* at 111).

On cross-examination, Young refused to answer the State's questions about whether he was in the Terra Linda house at the time of the murders and how he came to know the details of the murders that he provided in his confession. The court held the questions were relevant and proper and directed Young several times to answer or explain why he would not do so. When Young still refused to answer, the State moved to strike his testimony. The

court explained to Young that the State was moving to strike his testimony in its entirety because he refused to answer the State's questions and gave Young an opportunity to be heard. The court then struck Young's testimony in its entirety. (Ex. 255 (Tr. 140-60)).

The trial court denied the motion to suppress, finding there was no evidence to support Young's version of events and that Young waived his *Miranda* rights and voluntarily provided his statements to the detectives. (Ex. 266).

Trial thereafter commenced. At trial, the following relevant evidence was presented.

On the night of August 13, 1998, Justin Perkins was at the Terra Linda house until about 9 p.m. (Ex. 273 (Tr. 62, 65-67)). A VCR and a PlayStation were in the house at the time. (*Id.* at 66-67).

Nick Delucia lived next door to the Terra Linda home. (*Id.* at 78; 81-82). When he left for work around 1:30 a.m. on August 14, 1998, he observed two people in the front yard of the Terra Linda home; one of them had a hose and was watering the front yard. (*Id.* at 80).

Perkins returned to the house the next day around 6 p.m. (*Id.* at 68). He found the front gate open and the door slightly ajar; he also noticed that one of the cars belonging to the house was parked in an unusual spot. (*Id.* at 69). Perkins walked through the front door to find Jeff Biddle face down on the floor with his hands duct-taped behind him. Blood was all around. (*Id.* at 73). He then saw Tracey Gorringe and Matt Mowen, also duct-taped and

bloody. He then ran out the door and asked a neighbor to call 911. (*Id.* at 73-74).

Shortly after, the authorities arrived at the home to find it ransacked. (Ex. 273 (Tr. 104, 114-15, 149-65)). The bodies of Biddle, Gorringe, and Mowen were found in the living room, and the body of Talamantez was found in the dining room. (*Id.* at 155). Several empty or mostly empty wallets were located. (*Id.* at 161). A large number of coins was also found but no larger currency. (*Id.* at 162). Prints on a box of Black and Mild cigars, which Johnson was known to smoke, and DNA on cigarette butts recovered from the scene, matched Johnson. (Ex. 273 (Tr. 143, 189-90); Ex. 276 (Tr. 39-40)). Young's DNA was not recovered from the scene. (Ex. 276 (Tr. 40)).

Ace Hart testified that until July 1998, he was living with two other people in a house on Everman Drive. (Ex. 273 (Tr. 118-19)). Just before Hart moved out, Johnson, Young, and Johnson's girlfriend began staying at the home in the master bedroom, and they continued to do so after Hart moved out. (*Id.* at 120-25, 143-44). When they moved into the home, the trio brought with them a duffel bag. (*Id.* at 143-44). Hart testified that Young and Johnson were best friends and were always together. (*Id.* at 125).

Hart testified that he was at the Everman house one day in late July or early August, when Mowen came over and bragged about how he had recently made $10,000. (*Id.* at 126-28). Young and Johnson were both there when he made the statement. (*Id.* at 126-28).

On August 15, 1998, Hart went to the Everman house to retrieve some belongings. (*Id.* at 129). There, he saw Young, Johnson and

Johnson's girlfriend watching the news. On the news was coverage of the killings at the Terra Linda house. (*Id.* at 130). Johnson and Young together told Hart they had committed the crime and explained how they did it. They said they went to the house with the intent to rob Mowen. When they arrived, Mowen was outside watering the yard. Young and Johnson told Hart that they forced Mowen inside. Another of the victims was inside the house when Young and Johnson took Mowen in the house. Then another person arrived in his vehicle later and was forced inside by Johnson.[4] Then, they said, a "Mexican kid" came to the house. Young and Johnson said the "Mexican kid" was "talking shit" so Young and Johnson took him in a back room and shot him. Young then said that, because "three other guys" -- Mowen, Biddle, and Gorringe[5] -- were in the house and had witnessed the murder, they had to kill them, too. Hart testified that throughout the conversation, Young's demeanor was calm and matter-of-fact. Young and Johnson said they obtained only about $200 but that they also took a Nintendo, a VCR, and a pager. (*Id.* at 131-37). After the crime, Hart noticed that there was a VCR and a PlayStation in the Everman house, which had not been there previously. (*Id.* at 137, 141-42).

LaShawnya Wright testified that in August 1998, she was living with Sikia Smith. (*Id.* at 168). Over that summer, she saw Smith, Young, and Johnson together on a few occasions. (*Id.* at 170). Young and Johnson were "homeboys." (*Id.* at 174).

---

[4] Hart did not know which victim was already in the house and which arrived a short time later.

[5] Hart did not identify the "other three" by name, but the evidence in the record establishes that the "other three" were Mowen, Biddle, and Gorringe.

9

On August 13, 1998, Wright was at the apartment with Smith most of the day. (*Id.* at 172). Smith left about 10:30 or 11 p.m. with Young and Johnson. (*Id.* at 172-73). He did not return home until 1 p.m. the next day. When he did, he was carrying a VCR and a Nintendo. (*Id.* at 174-75). Young and Johnson showed up about 10 minutes later. (Id. at 175). When Wright asked Smith where he had been, he wouldn't tell her. (*Id.* at 176-77). He was acting a little shaky and nervous. (*Id.* at 177). Johnson gave Smith $20 for the VCR. (*Id.* at 177-78). Young then asked Smith if he could have the Nintendo. (*Id.* at 178-79).

Three or four days later, Wright was at the Desert Hills Motel with Smith and a few other persons, including Young. (*Id.* at 179-80). Wright heard Young talking with other people, including Smith, about his and Johnson's involvement in the murders. (*Id.* at 180-82).

Young's former girlfriend, Elizabeth Nevarez, also testified. During the summer of 1998, while she and Young were together, Nevarez kept a calendar. The calendar reflected that Nevarez saw Young on August 13, 1998, and August 14, 1998, and that Young was in California from August 22, 1998, to August 30, 1998. (Ex. 275 (Tr. 107-14)). At some point before Young's arrest, Nevarez and Young were watching the news and saw that Johnson had been arrested; in response to this, Young said he had to go. (*Id.* at 115). After his arrest, Young told Nevarez that he had participated in the murders by tying up the victims and acting as the lookout. (*Id.*) He told her his only intention that night was to rob, not to kill. (*Id.* at 117).

On August 17, 1998, two people who identified themselves as Donte Fletch and Red, which was Young's alias, were pulled over for speeding. During the stop, they both fled and escaped. (Ex. 273 (Tr. 191-98)). The officer who pulled them over searched the car and found under the passenger seat a loaded sawed off 30 carbine rifle. (*Id.* at 199-20). A few days later, the officer learned that the two men he had pulled over were Johnson and Young. (*Id.* at 201-02).

The Everman house, where Young was staying, was searched. There, authorities found a VCR which they believed belonged to Mowen, a PlayStation, a duffel bag with a roll of duct tape on top, jeans on which was Gorringe's and Johnson's blood, and a Rueger .22 caliber semi automatic rifle. (Ex. 275 (Tr. 75-80, 99); (Ex. 276 (Tr. 36-37); Ex. 273 (Tr. 143-44)). A pager was also recovered, buried in the backyard. (Ex. 275 (Tr. 81-82); Ex. 273 (Tr. at 138-39)). Pants and shoes believed to belong to Young were also found in the Everman house. (Ex. 281 (Tr. 123)). The murder weapon was never recovered. (Ex. 281 (Tr. 140)).

The jury found Young guilty of all fourteen counts. (Ex. 287). Young was sentenced on each of the four murder counts to a term of life with the possibility of parole after twenty years, plus a consecutive term of life with the possibility of parole after twenty years, on each of the kidnapping counts to a term of life without the possibility of parole, plus a consecutive term of life without the possibility of parole, on each of the four robbery counts to a term of 180 months with the possibility of parole after forty months, plus a consecutive term of 180 months with the possibility of parole after forty months, on the conspiracy count

to a term of 120 months with the possibility of parole after 24 months, and on the burglary count to a term of 180 months with the possibility of parole after forty months, all terms consecutive. Judgment of conviction was entered on August 3, 2006. (Ex. 310). Young did not file a direct appeal.

On December 12, 2006, Young filed a state postconviction petition, which was dismissed as unverified and not in compliance with the court's form. (Exs. 318 & 325). Before it was dismissed, Young filed a second petition on February 27, 2007. (Ex. 324). That petition was denied on December 3, 2007, on the grounds that the claims could have been raised on direct appeal. (Ex. 336). Young did not appeal either order.

In August 2008, Young filed a "motion to appoint counsel to my direct appeal." (Ex. 338). The motion was granted on November 9, 2008, and Lisa Rasmussen was appointed "for the purpose of filing either a direct appeal or a petition for post-conviction relief, whichever she deems appropriate under the circumstances." (Ex. 341).

Then, in March 2014, Young filed a motion for appointment of new counsel. (Ex. 343). The court denied the motion. (Ex. 346). Although Young attempted to appeal, the appeal was dismissed for lack of jurisdiction. (Exs. 347 & 351).

Then, on September 22, 2015, Young filed another state postconviction petition for habeas relief. (Pet. Ex. 52). Young proceeded to file several amended petitions. (*See* Exs. 357, 358, 361, 366, 367, 370, 374, 376,[6] 396, 405, 407, 424, 425, 431, 440,

[6] Although large segments of Exhibit 376 are too dark to be read, this is also true of the document on file with the Nevada Supreme Court, which

449, 458).[7] On appeal, the petitions were denied as untimely, successive, and due to laches. (Exs. 423, 427, 441, 461).

On February 14, 2017, Young filed his original petition for federal habeas relief. (ECF No. 1-1 at 2). He later filed a first amended petition. (ECF No. 7). Counsel was appointed and filed a second amended petition. (ECF Nos. 20 & 32). Ground One of the second amended petition asserted that the trial court violated Young's rights by denying the motion to suppress because he was not properly advised of his *Miranda* rights and his confession was involuntary. (*Id.* at 8-17). Ground Two asserted that the trial court violated Young's rights by failing to consider that he could not have waived his *Miranda* rights because he was incompetent to do so. (*Id.* at 17-37).

Respondents moved to dismiss the second amended petition as untimely, procedurally defaulted, and unexhausted in part. Young, while admitting the petition was untimely on its face, asserted entitlement to equitable tolling on the basis of mental impairment and ineffective assistance of postconviction counsel. Young also acknowledged that Ground One of the petition was procedurally defaulted but asserted cause based on the same mental impairment.[8]

_____

this court ascertains by taking judicial notice of that court's docket. *See* http://caseinfo.nvsupremecourt.us/public/caseView.do?csIID=37840 (last accessed Oct. 3, 2019). The legibility does not impair the court's review of the document, however, as the obscured pages appear legibly elsewhere in the record.

[7] One of the petitions that appears on the record was stricken following a motion by the State. (*See* Exs. 363, 389 & 397).

[8] Young also asserted cause for his default based on the ineffective assistance of postconviction counsel under *Martinez v. Ryan*, 566 U.S. 1 (2012), but the court held that *Martinez* could not save Ground One because Ground One is a claim of substantive trial court error.

13

On October 15, 2019, this court entered an order finding the petition untimely on its face, Ground One procedurally defaulted, and Ground Two unexhausted. (ECF No. 66). Due to the complexity of Young's claim of mental impairment during the relevant time periods, the court deferred a determination of whether Young was entitled to equitable tolling or could establish cause for the procedural default until after it had an opportunity to consider the merits of Young's claims. The court directed Young to elect how he would like to proceed on what, at that time, was a mixed petition.

On November 4, 2019, Young elected to abandon his unexhausted claim. (ECF No. 67). The court then entered an order dismissing Ground Two and directing respondents to file an answer. (ECF No. 68).

"Where it is clear that deciding the merits of a claim will prove to be less complicated and time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claims on their merits and decline to engage in a lengthy and involved cause and prejudice analysis." *Carter v. Chappell*, 2013 WL 1120657, at *37 (S.D. Cal. Mar. 18, 2013), *aff'd sub nom. Carter v. Davis*, 946 F.3d 489 (9th Cir. 2019) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002). The procedural issues in this case involve a complex claim of mental impairment. Therefore, the court now determines that a decision on the merits of Young's substantive claim is less complex than determining whether Young is entitled to equitable tolling or can establish cause for procedural default with respect to Ground One.

## II. Analysis

In Ground One, Young asserts the trial court's failure to suppress his confession was a violation of his *Miranda* rights and his right against self-incrimination and to due process. (ECF No. 32 at 8). Young asserts that his confession was taken in violation of his *Miranda* rights and was involuntary.

Respondents answer that the trial court's finding that Young voluntarily waived his right to counsel and agreed to speak to detectives was not clearly erroneous. Moreover, respondents argue that the evidence against Young was overwhelming, so any error was harmless.

Young replies that his mental health limitations precluded him from adequately developing the state court factual record on this claim and, thus, the state court's factual findings should not be entitled to deference. He further argues that his confession was strong evidence, so despite the other evidence of his guilt, it cannot be said with confidence that the outcome of the trial would have been the same even if the confession had not been admitted.

*Miranda v. Arizona*, 384 U.S. 436 (1966) requires that before a person can be subjected to custodial interrogation, they must be notified that they have the right to remain silent and the right to the presence of an attorney. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). Interrogation must cease once a defendant unambiguously invokes his rights. *Id.* at 382-83.

A statement made during custodial interrogation is admissible only where the defendant knowingly and voluntarily waived his rights under *Miranda*. *Id.* at 381-82. A waiver must be "voluntary

in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83 (internal quotation marks omitted).

"A confession is involuntary if it is not "'the product of a rational intellect and a free will." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011). Whether a confession or waiver is involuntary is judged under the "totality of the circumstances." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). "The factors to be considered include the degree of police coercion; the length, location, and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown*, 644 F.3d at 979.

The admission of an involuntary confession at trial violates a criminal defendant's due process rights under the Fourteenth Amendment. *Lego v. Twomey*, 404 U.S. 477, 483 (1972). That said, a petitioner is entitled to relief only if the admission of the confession caused him actual prejudice – that is, that it had a "substantial and injurious effect" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Young asserts that his rights were not properly explained to him, he was forced to sign the *Miranda* card, and he was told that he had to talk because he was being investigated for murder. He asserts that "after several hours," (ECF No. 32 at 10), the first interview ended when he invoked his right to counsel. Young argues that this doesn't appear in any of the recordings because the side of the tape on which he invoked his rights has been irretrievably

lost. Young asserts that before the second interview, a new set of detectives questioned him un-recorded for more than 30 minutes, and that during this period they badgered and threatened him to tell the truth. Then, at the second interview, another set of detectives interviewed him and Young asserts they did not remind him of his rights before doing so. Young asserts that at the end of the second interview, he invoked his right to counsel. At that point, he argues, it had been more than eight hours during which he had been badgered, threatened, and deprived of food and water. Young admits that he asked to speak with detectives after being transported to CCDC, but he asserts he was not readvised of his rights before being interviewed again. He asserts that he was promised a lenient sentence if he cooperated, and it was this promise, in combination with the earlier deprivations of food and water, the length of the interrogations, his youth and the fact he had never been in serious trouble before, his mental health issues, and the violence of his arrest that caused him to confess. In all, Young asserts he invoked his right to counsel at least twice, and that the officers ignored his requests.

In denying Young's motion to suppress, the trial court ruled that there was no evidence to support Young's contention that he had invoked his right to remain silent or his right to counsel. (Ex. 266 at 3).[9] The court held that that the evidence established Young was advised of his *Miranda* rights and that, after he was transported to CCDC, he asked to speak with the detectives. The court further held that Young's confession to detectives was made after he had been reminded that his *Miranda* rights still applied

[9] Citation is to original page of document.

and that Young confessed to the crime voluntarily in order to "tell the truth" and was not coerced or under duress. (Ex. 266).

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Under § 2254(e)(2), the court shall not hold an evidentiary hearing on a claim

> "[i]f the applicant … failed to develop the factual basis of a claim in State court proceedings … unless the applicant shows that -- (A) the claim relies on … (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The court "may not grant in this case an evidentiary hearing if [the petitioner] 'has failed to develop the factual basis of a claim in State court proceedings.'" *Bragg v. Galaza*, 242 F.3d 1082, 1089 (9th Cir.), *opinion amended on denial of rehg*, 253 F.3d 1150 (9th Cir. 2001).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

Following review of the record, including the transcripts of the evidentiary hearing, the trial, and Young's interviews, the court concludes that the state courts' factual findings were not clearly erroneous. Young's contention that he was not properly advised of his *Miranda* rights and/or that his confession was not voluntary is not supported by the record because that evidence was stricken. The evidence that is part of the record supports the conclusion that Young was given his *Miranda* rights and reminded that the rights still applied at the beginning of each interview, and that he did not invoke his rights to counsel or to remain silent at any time during the interviews. A change in location and interrogator does not necessarily require re-administration of *Miranda* warnings, particularly where one interrogator remained constant. *United States v. Andaverde*, 64 F.3d 1305, 1312–13 (9th Cir. 1995) ("Certainly, the two interrogations were so interconnected in time, subject matter, and by [one officer's] presence that [the defendant] must have known that his rights had not materially changed simply because he had been moved into a different room and faced a new interrogator.") There is additionally no bright-line rule as to the amount of time a *Miranda* warning remains valid, but warnings have been found still to be valid even for interviews conducted the next day. *See United States*

*v. Rodriguez-Preciado*, 399 F.3d 1118, 1128-30 (9th Cir.), *amended*, 416 F.3d 939 (9th Cir. 2005). While here the interviewers, topic, and, at one point, location changed, the interviews occurred close in time in a single day over a nine-hour period, Detective Thowsen was present at all of the interviews, and Young was continuously in custody the entire time. On several occasions, Young was asked if he understood his rights, and he indicated that he did. Thus, "there were no intervening events which might have given [Young] the impression that his rights had changed in a material way." *Rodriguez-Preciado*, 399 F.3d at 1129.

In addition, none of the record evidence supports a finding that Young was coerced into confessing. It was Young himself who initiated the last discussion, in which he confessed, with a stated desire to tell the truth. The transcript reflects that it was Young who sought to obtain a deal from the State. Nothing in the transcripts of any of Young's interviews suggest Young's confession was involuntary.

Young agrees that state court factual findings are generally entitled to deference, but he points to two exceptions: (1) where the state court does not allow the defendant to present evidence; and (2) where the state court fails to consider and weigh relevant evidence. *Taylor*, 366 F.3d at 1001. Young asserts that by allowing him to represent himself, despite the fact that he should not have been allowed to do so, and then striking his testimony, the state court failed to allow and consider relevant evidence on Young's claim.

The court does not find Young's contention persuasive. The state court did allow Young to present evidence, but ultimately

struck the evidence because Young refused to submit to cross examination. This was a proper exercise of the court's discretion. *United States v. Panza*, 612 F.2d 432, 438 (9th Cir. 1979) ("Historically the trial court's discretion has included the power to strike the testimony of a witness who improperly refuses to answer questions on cross-examination."); *see also Williams v. Borg*, 139 F.3d 737, 740-43 (9th Cir. 1998).

Even if the state court findings were not entitled to deference and Young's testimony was made a part of the record and credited by the court, Young still would not be entitled to relief. Relief is available "only if the … court ha[d] grave doubt about whether [the admission of his confession] had substantial and injurious effect or influence in determining the jury's verdict." *Davis v. Ayala*, 135 S. Ct. 2187, 2197-98, (2015) (internal quotation marks omitted). The error must be harmless beyond a reasonable doubt. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991).

The court must exercise extreme caution before determining admission of a full confession was harmless. *Id*. at 296. Here, the evidence of Young's guilt was overwhelming. Three separate witnesses testified that Young confessed to his involvement in the murders. To Hart, Young provided a detailed description of the particulars of the murders. These details were also corroborated by the physical evidence recovered from the Terra Linda and Everman homes and by the testimony of the other witnesses. In light of this evidence, the court concludes that even if the admission of the confession was in error, Young would not be entitled to relief, because any such error was harmless beyond a reasonable doubt.

As Young is not entitled to relief on his sole remaining claim, the petition will be denied.

### III. Motion for Evidentiary Hearing

Young has filed a motion for evidentiary hearing to develop his claim of mental illness, which relates to both the question of equitable tolling and to cause for his procedural default. Because the court has elected to resolve the petition on the merits, it need not reach these procedural issues, and therefore an evidentiary hearing is not warranted. The motion for evidentiary hearing is therefore DENIED.

### IV. Certificate of Appealability

In order to proceed with an appeal, Young must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Allen*, 435 F.3d at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951 (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, Young has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.*

The court has considered the issues raised by Young, with respect to whether they satisfy the standard for issuance of a certificate of appealability and determines that none meet that standard. Accordingly, Young will be denied a certificate of appealability.

**V.    Conclusion**

In accordance with the foregoing, **IT IS HEREBY ORDERED** that the second amended petition (ECF No. 32) is DENIED, and this action is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Young is DENIED a certificate of appealability.

IT IS FURTHER ORDERED that Young's motion for evidentiary hearing (ECF No. 77) is DENIED.

The Clerk of Court shall enter final judgment accordingly and CLOSE this case.

IT IS SO ORDERED.

DATED: This 31st day of March, 2020.

_____
UNITED STATES DISTRICT JUDGE